Case number 211664, Paul Harcz Jr et al. v. Brody Boucher et al., argument not to exceed 15 minutes per side. Mr. Fedenski, you may proceed for the appellants. Good morning, Your Honors. May it please the Court, I have reserved five minutes for rebuttal time. Assistant Attorney General John Fedenski, appearing on behalf of the Michigan State Police Appellants. I am here to extol the virtues of the beauty of gray, and those of us who grew up in the 90s may recognize that as a song title from the debut album of a band called Live, but even if the cultural reference is unfamiliar, the jurisprudential point is a bedrock principle in the law of qualified immunity and governmental immunity. Judge McKee encapsulated the point in a case called Red Laugh v. Gillespie, cited in both our briefs, quote, Officials are not liable for bad guesses in gray areas. They are liable for transgressing bright lines. No bright lines were transgressed. Your reference, I just didn't catch it. Sure. Beauty of... Beauty of gray, the color gray. Gray. So plaintiffs have a very black and white narrative. You want there to be a gray area, got it. Right. It's not what I want, Judge, it's what actually happened. And I think that's the difference between the prior appeal and this case. In the prior appeal, it was at the motion to dismiss stage where plaintiff's allegations had to be taken as true. And the previous panel said, well, one of their allegations is there was no basis whatsoever for the purported reasonable time, place, and manner restriction on the protest at the Capitol. On remand, we have the advantage of sworn deposition testimony, something more than just complaint allegations, but sworn deposition testimony from the non-party former defendant, former private party defendants, who told us what they told police in the lead up to the event and on the morning of the event itself. And those key witnesses are Gravetti and Weaver. And Sergeant Held was sort of... You're talking about what they're planning to do or what some people are planning to do? Correct. They were... Is one of them the person who said, we're bringing 500 people? No. I believe her, she estimated that the protest would be bringing anywhere from 50 to 500 people. Yeah, that's what I meant. Right. She wasn't part of the protest. She was part of the... If not one of those two people. Right, right. And I think there's a dynamic here in terms of the splinter group, the former organizer dynamic of the case that we don't have in any of the cases cited by the plaintiffs here. And that's critical for the clearly established prong of a First Amendment violation that you have to show here. And so really the inquiry, and I think the trial court felt a little constrained by the prior Sixth Circuit opinion, but the inquiry is, was the decision to designate a protest area and eventually to bring metal barricades so beyond the pale as a matter of First Amendment law, so wrong, black and white, that officers involved in that decision, officers who followed that decision, officers who were briefed on that decision who weren't even on the scene, command officers, that they should stand trial on the damages claim for violation. That's why I raised about the 500 that, at least at one look at it, that would raise some concern. And then it turns up you've got seven people because when you talk about time, place, and manner, usually, not always, but usually those are rules, those are statutes, those are permit, you know, that are set out in advance. So here I agree with you that they're having to contend with the situation. And at some point when you get from 500 down to seven down to one, does it become such that no reasonable officer thinks that you need to do that and keep them away from a open public place that has been advertised, correct, as free and open to the public? Right. I would add to that question, Judge. We have seven plaintiffs, but the initial group that approached, I think, was, the record said there were 15 of them. You have only one who tried to breach the police line. And you have... Arguably? Well, I don't think it's arguable at all. I think even taking his version as true, he disregarded a police order. And the question is, could a reasonable officer have... If you watch the video, it's unclear who's pulling whom or who's going over. I'm not saying that you're wrong, but I didn't think it was undisputed that he was breaching the line as opposed to coming up to the barricade and... Well, I think what's undisputed is he said, this barrier is phony, I'm going to try and cross it. That alone, with or without violence, is a probable cause for that person to be arrested for breaching what police thought was a reasonable lawful order. But getting back to the nature of the forum, I think Judge Quist pointed out, it's a very confined area. Yes, the public was invited to see this event, to hear speeches, to hear music. The Lieutenant Governor was one of the speakers, I believe. But you also have a sort of zones within that zone. I agree with that and one of the questions, the sort of tougher question is, were they going to storm the stage? Were they going to interfere with the speech? Or were they just going to pass out leaflets on the fringe? When do you get to make that decision, I guess? Sure, and I think you need more than conjecture to make that decision and I think that's what we had here. You had Gravetti and Weaver say, we have concerns, they're going to try and shut down the event. They're not just going to pass out leaflets quietly and peacefully. They're going to chant and try and drown out the speaker. You've got, as you just said, it's the, it's internecine process here, so do they get to take that as gospel as opposed to assessing the situation? Well, I think what you had was a sort of, again, within a gray area decision. How do we maximize speech rights here? How do we avoid a heckler's veto? How do we avoid a heckler's veto? One of the plaintiffs, by the way, brought a bullhorn with her. There's no explanation for why other than for some contingency or to drown things out or to chant from farther away. But unlike any of the cases cited by plaintiffs, it's undisputed the protest zone was within earshot, within eyesight of the permitted event. They were not moved a third circuit case, the Startzel case. And I think you had enough for a reasonably prudent officer to say, let's keep these groups within the designated area, but separate. No one was thrown off of the Capitol grounds. No one was moved across the street, placed behind a bus, or in any way prevented from exercising their First Amendment rights. And it's just that sort of creative compromise within a gray area that ought to be immunized. And I think the court ought to examine more closely what individual involvement did each of my clients have in that decision to separate. Sergeant Held is the one who made the decision on the field, on the spot, command Boucher and Williams. We do have to look at that as to what a wide variety of reasonable officers might think, but the facts we have to look at from their point of view in the most favorable way so that if they say, if there's any argument about they said we're not going to disrupt, they said we're only going to do that, we have to take that as given as being true that that's what they said. Now you can then argue about should the police have believed them. Sure. Right? But we have to take the operative facts from their point of view. Sure. And I think that goes hand in glove with the Fourth Amendment claim of Mr. Haar's. Whatever your internal subjective belief or motivation is, police are not privy to that when they're making on the field split second kind of decision or in a fluid evolving set of circumstances sort of case. And that's why not just in First Amendment cases, but in false arrest cases, excessive force cases, this court gives officers a break and says we will not judge these things by hindsight in the quietude of our courtrooms or our chambers unless something plainly incompetent or knowingly violative of the law happens. That didn't happen under the First Amendment and it certainly didn't happen under the Fourth Amendment. Because even accepting plaintiff's version as true, Mr. Haar's version, I was feeling around trying to get around trying to get through. Police under those circumstances could infer, okay, he's aware of the police line, he's trying to breach it, we're going to arrest him with or without any violence, with or without any crediting of one characterization or one version of events. And in similar measure under state law for the state law claims, the real question here, legal question, not factual question, is do any of the officers who were involved in the arrest, did they act in a manner that indicates a question of fact on having malice or having acted in bad faith? Can I ask you, early in your argument you mentioned clearly established, which of course is one of the two prongs, but has already been decided by an earlier panel in this same case. Well, what they decided is that deploying a time, place, manner restriction with no basis whatsoever, which is what was alleged in the complaint, is a clearly established violation. Now the argument is, under the nuanced gray facts that came out in discovery, is that a clearly established violation? Why isn't it just whether, why isn't it just whether there was a, whether that right was violated? In other words, even if we accept that as true, which is part of the case law, part of the law of the case, are the same points you're making all just sort of whether there was a constitutional violation here? I mean, whether this was time, place, and manner or whether it was something else? Well, I think the question is, we're using a different body of facts, a different set of circumstances. What they alleged in their complaint is a black and white narrative. What has been revealed in discovery is more nuanced and has lots of gray in it. And so the question for this court is, based upon that body of facts, were the officers acting in a gray area that's immunized? The previous panel wasn't asked that question. They were asked... It depends on how you read those. It depends on how you... I mean, your point is, you can't the protestors can't be unduly disruptive and the officers have a right to control them if that's happening. Correct. And... So that's not... I mean, correct. There's no clearly established right to be disruptive to police. Exactly. And there's no... Right. Why isn't this a fact? Why is this a question of whether the first, the way it was stated originally about law enforcement can erect time, place, and manner restrictions but can't discriminate based on content or viewpoint? And isn't this just a discussion about what the officers were doing? Whether it was just time, place, and manner and nothing to do with content or thought or that was sort of the MO, that these people have alternative view, and so we're going to be harder on them. We're going to push them further away. We're going to harass them. Yeah. I think, Judge, the question... I think what we have here is a content-neutral time, place, manner restriction. And we have... It's not set in my brief, but I should mention the case. It was decided after this, the facts of this case, but I believe it's called the Hartman case. Judge Sir Heinrich authored that one. If I find the site... You're always free to submit those. Yeah, sure. The site in that particular case... In other words, if you had submitted it, you wouldn't be fumbling for the presentation right now. You're right. And if I could read my notes, I wouldn't be fumbling for that. Go ahead and submit it. Sure, we can do that. Just to finish up, going back to the time, place, and manner, is time, place, and manner based on reasonable fear of disruption, really? Isn't that it? That's why I started with the 500. If there are 500 people coming and saying, you know, we're going to make our views known at the stage, that's one thing. You've got 15 people who say that they're just going to hand out leaflets. Who gets to look at that evidence of how disruptive they are? Because if they're not, and that's their position... For example, if they were wearing t-shirts and wanted to go sit in the audience with other free and open public people, would you have been able to do anything to them? I think probably not, Judge. And I think as a matter of both just simple violation of the First Amendment or clearly established violation of the First Amendment, none of the cases emphasize number of protesters or number of counter-protesters. I understand 500 is a different scenario than 15. You're right. I mean, even one can be disruptive. That's my point, right. But, on the other hand, the less there are, maybe the less reasonable it is. That gets us back to the factual question. I think that's true, and I think none of the cases have the dynamic of, these are folks, some of them at least, who were involved initially in organizing this event who may try and assert some control or dominion over the event. Control of the stage, control of the... It's always what we see at colleges and elsewise. If it gets bad enough, is that people, well, they're always clearly contrary, and if they want to take over the event, that's what happens at least arguably in a lot of these. And I don't think Judge Quist had a case that told him you have to wait until a punch is thrown or you have to wait until a stage is stormed. And so that is yet another reason this would be in the gray area of politics. To have enough to have, for that fear to be somewhat reasonable, right? I mean, because otherwise you can always say that. The person just says, hey, I'm just here with a sign in the back. Well, you could go up to the stage and attack them. Exactly, and I think we have much more here based on what we have from the depositions of the organizers. Okay, well, we'll look at it. Thank you, judges. May it please the Court, my name is Andrea Evans on behalf of Appalese. When plaintiffs arrived at the Michigan State Capitol, Sergeant Held met them and told them that the ADA event had dibs on the State Capitol. The First Amendment does not allow the government to enforce a diplomatic regime on a traditional public forum, which is what the Michigan State Capitol is. Well, could they if they had gotten a permit to that effect? Well, Your Honor, cases like Parks v. City of Columbus established that a traditional public forum does not lose its status as such just because there is a permitted event going on. No, but if the permitted event had conditions on it, I mean, there are only 300 seats and your permit allows you to decide who sits in them, for example. Then perhaps that could be true. You have vendor tents in the back of your event and nobody else can have a vendor tent. I mean, wouldn't, there's no reason those wouldn't be, I'm not saying that's what happened here, I'm just pushing it a little bit on whether you're saying that any time it's a traditional public forum, you could never have an event that has some control. It's possible that there could be some level of control in a permit, that's true. But what the Constitution won't allow is a content-based restriction on speech, which is what happened here. So the defendants excluded plaintiffs because the event organizers didn't want them there because of their dissenting voices. And that is a content-based restriction. And even Sergeant Held's deposition testimony, which the district court cited in its opinion, was that if plaintiffs had been invited to the event, then they would have been treated differently, not as a, quote, separate opposing viewpoint. And so this was a content-based restriction on plaintiff speech. And I want to talk a little bit about disruption. My clients, six of them are blind. One of them uses a wheeled walker to walk. And so the idea that they would somehow storm the stage and overtake the sighted folks running the event is facially impossible. How about the police line? In other words, say you're right, the officers were imposing content-based restrictions, but then the people who want to access the stage or the facility act in ways that are disruptive to law enforcement. Is that offset? Does that mean there can be a first-minute violation, but there should be no damages because they were going to be excluded anyway because they're harmful? How do we reconcile that version of the story? The defendants decided to impose this restriction on plaintiff speech before they even stepped foot there at the state capitol. And so that is the harm that we're here discussing. And there are damages that flowed from that. But the later disrupt, which was in the first appeal in this case, the court said that what happened after plaintiffs were stopped there at that barricade could not justify the restriction that defendants had already decided to impose before. Assuming there was disruption, we just ignore that? Is that at all relevant to the case? It is relevant to Mr. Hartz's individual claims. But as to the First Amendment claim, at least in the first appeal in this case, the court found that what happened after plaintiffs were excluded from the event was not relevant to justifying the restriction. And I would add that in our first visit before this court, it's true that the court only was looking at the pleadings but also had the videos that have been submitted in this appeal. And also it was alleged in the complaint that the event organizers told the state police that they were concerned that there might be some type of disruption. That was in the complaint and therefore before this court in the first appeal. And that is all that the evidence confirmed on remand during discovery. The event organizers had these concerns. There was no factual basis for it. There was no reason to actually believe that there was any type of disruption that was going to happen. They just had a worry. And one can expect it's not great news to hear that people are coming to protest an event that you're putting on. But to restrict someone's speech on a traditional public forum just because people had worries, the case law establishes that's just not enough. There has to be something more concrete, not merely conjectural. That's what cases like Turner v. FCC and Sayag v. City of Dearborn establish. It has to be a more concrete reason and there just wasn't that. Yeah, I agree with you. I'm just again trying to reconcile the alleged disruption that did occur. There was some scuffle with the police crossing a police line, at least that's one version of the story. It's only relevant to the individual claim. Does that somehow cut off the damages because even if they're wrongfully limited from entering for a certain period of time, as soon as there was an actual disruption, then that might then justify blocking them from entering the grounds? My understanding is that even under defendant's version of the events, it was only one plaintiff who ended up being arrested. And I'd like to throw into there People v. Moreno, which is a Michigan Supreme Court case saying that citizens are allowed to resist unlawful orders. So the fact questions that the District Court found on the First Amendment claim, the things that we're discussing here about whether the restriction was imposed lawfully, those all also factor into whether Mr. Hart's actions were justified. Would that be something that could be argued to the jury on damages? I can imagine, tell me if I'm wrong, that a juror could say, okay, you violated their rights. You're really rowdy. And the rest of the time, you shouldn't get any damages for. So I as a juror will decide that your damages are only this much. You're claiming that your damages were that much for how long your First Amendment rights were violated. Anything wrong with that as a jury argument? No. In our position, that would be something for the jury to resolve, the amount of damages caused by that restriction on plaintiff's speech. So it wouldn't retroactively take away your First Amendment rights, but it might limit your damages? Right. I would agree with that, Your Honor. Fair enough. Would you still be the prevailing party? Not if you get any damages, aren't you? I believe we would, Your Honor. I also wanted to talk a little bit about some of the other fact disputes that have been raised here. It is not true that it's undisputed that plaintiffs were close enough to the event that they could hear and be heard. That is a fact dispute. The district court found that to be a fact dispute. There's testimony that actually they couldn't be heard from the stage and that there weren't other people around plaintiffs. Looking at that part of it troubles me a little bit because whether they could hear, I suppose that's something in terms of individual rights, but whether they could be heard sounds like they're asserting a right to speak over the people at the stage. See leaflets, people can take them or not, but if you're asserting your right to speak during an event, isn't that inherently disruptive? You can speak on the periphery, but if you're, you know, that sounds like why you bring a bullhorn. You bring a bullhorn so that other people can't fully hear what's going on on the stage. The evidence, the particular evidence I'm thinking of is that plaintiffs testified that there weren't other folks around them where they were barricaded so that they couldn't reach their intended audience. And that goes to whether there were ample alternatives. That's what I say. I understand that they'd like to get close enough to, let's say, leaflet to willing people, but that's where I sort of jumped on you as we were saying they couldn't be heard from the stage. If you're saying they weren't able to interact with other people, if you're, would you feel comfortable limiting yourself to that? They're being prevented from interacting with others on the capital grounds? Well, I would agree that the plaintiffs were not trying to be, to overshout anything or to be heard from the stage. That is not what plaintiff's intent was with their speech. But to the extent there would be some sort of argument that, okay, maybe there weren't other folks around them who could receive the leaflet, who could read the sign, but while they could have been heard from where they were standing, then that would not be a valid argument because there is evidence in the record that they actually couldn't be heard. And I do want to touch on the bullhorn for just a moment. Plaintiff Eleanor Walker, or Eleanor Cantor, who uses a wheeled walker, she had a bullhorn in her basket of that walker. And a police officer, she took it out at one point. An officer said, you better put that away. And then she put it back in her basket and it was not used. And so the fact that that could possibly justify restricting these people from a traditional public forum, that's just so conjectural that she would have even used it. And the fact that she put it away right away shows that it just wasn't necessary to completely exclude them from the event. And the moment... Was that after they had erected the barricades or not? That was before the metal barricades had been put up, but after, I believe it was before the metal barricades had been put up, but when the officers had already stopped them. They really had just approached the Austin Blair statue and they were met. Like a cross line, but no barricades. Yes, exactly. And this really is not an area of gray. As this court held in the first appeal, it's been clearly established for a long time, since 2005 when Parks versus City of Columbus came down, that you cannot just restrict people from a traditional public forum just because there's a permitted event going on there. That's not enough. And then again, cases like Turner versus FCC and Cy versus City of Dearborn established that you have to have something more concrete than a conjectural fear that some harm might potentially come to pass if you allow people their speech. And also, this court pointed to Startzell versus City of Philadelphia, which is a Third Circuit case and called that a blueprint for what defendants should have done in this case. And there, what the police did was they had even more concrete knowledge of disruption than was present here because the protesters in Startzell had actually written a letter to the police ahead of time and said, we are prepared to violate the law if necessary. However, they were allowed to enter this Pride Festival that was going on. They were allowed to be heard. They were up near the stage and they had bullhorns and they had signs. And so the police said, you're blocking the stage. Please back up. They backed up. Another scuffle arose and they weren't able to, they were blocking access to the vendors. And so then the police said, okay, you've got to back up even further. That is the blueprint that the Sixth Circuit in the first appeal said the defendants should have followed in this case. And they did not. Just look at what's actually going to happen, is happening as opposed to conjectural, which presumably conjectural not, would you have any comment on my colloquy with your colleague about 500 people were going to come that you would need some crowd control under those circumstances if they really did show up with 500 people? Sure. A crowd control is a government interest that might justify some type of restriction. But you're right that we didn't have it here. And I would add that the intel that the police had was not that there were 500 people coming, but that there were 25 to 500 people coming. And so to assume that it was 500 would be a stretch. And also the other intel that the police had received included that it was expected to be a peaceful protest. Not just that there was just no indication, not only was there no indication that this was going to be violent or really disruptive or anything like that, but there was actually affirmative evidence that it was expected to be a peaceful protest. And I would also point to the fact that defendants have referred to plaintiffs as a splinter group, further emphasizing the fact that their viewpoints, it was not just, if somebody had shown up to the state capitol with signs that said, I love the event, I love this event, I love the ADA, that those people would have been barred. This is not a content neutral kind of restriction. And so really, you know, the district court found that there's a fact dispute on this question whether or not it was content based. But if it was, then we're in the world of strict scrutiny. And there is certainly no compelling government interest. Defendants have not even identified a significant government interest here. So if your honors don't have any further questions. Questions? Okay, thank you. Thank you. So picking up on some of the questions I heard and some of the cases that were mentioned, you heard about Turner and you heard about Sayegh. Turner was a broadcasting rights issue. That case gives zero practical guidance to police officers enforcing a time, place, manner restriction. Sayegh was a complete ban on leafleting one to five blocks around the capitol zone. Nothing of that magnitude or scope or duration happened here. And if Starzl is the blueprint for what police should have done, what happened in Starzl was the protestors were moved a full city block away. And they were near a stage that was only a musical performance, not a speech presentation. And so. Am I right? They were moved after these various things had happened. Well, yes, the chanting and the use of bullhorns and those sorts of things. And I think it's a distinction without a difference, the idea that, well, we had a bullhorn, but we didn't use it. The question then is, what can a reasonably prudent officer infer from what they're encountering? And. Check off if you have a gun in Act One, you have to fire it by Act Three. Well, I think. And I think the whole reason for qualified immunity is something you've got to think about. And the police are very often between a rock and a hard place. And they're trying to ensure the speech rights of both sides. The folks who are there to protest, as well as the folks who are there to present their permanent event. And this court, in the previous appeal, when it upheld the dismissal of the claims against the private defendants, said that it was concerned about a chilling effect for organizers who go to police officers with their concerns. Whether those prove to be predictive or not. I think the flip side of that concern is, what is the chilling effect on law enforcement who responds to those concerns? Is it their job to disregard them? Is it their job to say, well, we don't think that's founded. Well, we're going to wait and see what happens. Or is it within the zone of gray, reasonable responses for sergeant held under those circumstances, hearing not just what was alleged in the complaint, but what was testified to in the deposition. They were saying they're going to shut it down. That is of a character entirely different from what this panel was considering, just based on the allegations. The idea, even if one of the organizers says, I'm concerned, they're going to shut it down. And held was asked about that in his deposition, how do you shut down an event? He says, well, you can do it physically by going on a stage, ripping up signs. You can do it by drowning out people with bullhorns or even with your own voices standing at the foot of the stage. So if you have a concern, whether it proves predictive, accurate or not, that folks are coming to shut down this event. To prevent that by designating a protest area is not a violation of any clearly established First Amendment law. The phrase shut it down comes from whose deposition? Both Gravetti and Weaver, and held quoted that. And plaintiffs don't have any- This is held quoting Gravetti and Weaver? Right, and in our brief, I think we have Weaver and Gravetti's sworn testimony too, and plaintiffs- They say they said it? That's what they say, and plaintiffs were not present for those conversations. And so they have no affirmative evidence to dispute those material facts. Not whether it proved to be predictive or true, but whether those utterances were made to held, who then told his command about it. Command relied on that under the fellow officer rule, and then the line officers relied on held. And so you have a sort of two-step process for getting rid of qualified immunity and on scene, who are relying on what held is feeding them. And you have the similar analysis for the line officers and for Sergeant Enriquez, who are responding to what held is telling them. And even if there are concerns, well, should we let them in, how should this be done? It doesn't mean that any officer knew it was clearly unlawful to set up that line. Let me just make sure so I can go back to the record. I would find all of this in the depositions of the three people held, Gravetti and Weaver. That's right, Judge. And I think to point you to even more of a summary, what we have in defendant appellant's brief, if you look at pages seven through 14 in our statement of facts. To the good pages. They're all right in there, page IDs and everything at the court's fingertips. Helpful, thank you. Sure, and if there are no further questions, we appreciate the court's time and consideration. Thank you very much, we appreciate the arguments. The case will be submitted.